**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA**
**Alexandria Division**

| | | |
|---|---|---|
| **MARY F. JONES,** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | |
| v. | ) | **Case No. 1:05cv11** |
| | ) | |
| **WASH. METRO. AREA TRANSIT AUTH.,** | ) | |
| | ) | |
| **Defendant.** | ) | |

**MEMORANDUM OPINION**

In this non-diversity personal injury case,[1] plaintiff sues for injuries sustained when she

tripped on a one-inch ridge in the sidewalk adjacent to defendant's bus-and-train station while

transferring between a bus and a train.  At issue on summary judgment is the standard of care that

defendant must observe with respect to hazards located on its premises.

**I.**

The record facts material to the instant summary judgment motion are undisputed.

Plaintiff Mary F. Jones is a Virginia resident who, at all times relevant to this lawsuit, commuted

daily from her home in Arlington, Virginia to her place of employment in Washington, DC.

Defendant Washington Metropolitan Area Transit Authority ("WMATA") is a municipal

_____

[1] Federal subject matter jurisdiction exists pursuant to Section 81 of the Washington
Metropolitan Area Transit Regulation Compact ("the Metro Compact"), an interstate compact
executed by Virginia, Maryland, and the District of Columbia and ratified by Congress pursuant
to its powers under Article I, § 10, cl. 3.  *See* Metro Compact § 81, Act of Nov. 6, 1966, Pub. L.
No. 89-774, 80 Stat. 1324 ("The United States District Courts shall have original jurisdiction ...
of all actions brought by or against the [Washington Metropolitan Area Transit] Authority.").
*See also* D.C. CODE ANN. § 9-1107.01 (2005); MD. CODE ANN., TRANSP. § 10-204 (2005); VA.
CODE ANN. §§ 56-529, 56-530 (2005).

corporation charged with operating the public bus and rail system serving the Washington, DC metropolitan area ("the Metro").

At approximately 9:00 a.m. on March 24, 1999, plaintiff, en route to work, disembarked the 16-U WMATA Metrobus at the Pentagon Metro Station, a transit station in Arlington owned and operated by defendant. From the bus's drop-off point,[2] plaintiff began walking toward an escalator descending to the rail platform, where, she intended, she would board a train to transport her to Washington, DC. Before reaching the escalator, plaintiff tripped on what she described as an "uneven seam," approximately one inch high, in the granite walkway leading to the escalator. As a result, she fell and injured her left knee.

At the time of the accident, WMATA occupied and maintained the walkway leading to the escalator by virtue of an easement. Thus, plaintiff tripped and fell on property occupied and maintained by WMATA as part of its premises at the Pentagon Metro Station. Significantly, the record is devoid of evidence that WMATA had notice that the one-inch seam on which plaintiff tripped was a hazard to persons traversing the area. In the two years preceding plaintiff's accident — 1997 to 1999 — there were no reported trips, falls, or injuries arising from the station walkway, despite the fact that in 1999 alone almost eight million persons entered or exited there,[3] substantial numbers of whom must have passed over the uneven seam.[4]

---

[2] Plaintiff avers that on the date in question, the bus stopped between 20 and 25 feet short of its normal drop-off location. Because this fact played no causal role in the incident, it is not material to the issue at bar.

[3] In 1999, 7,926,859 persons entered or exited the Pentagon Metro Station, 29,337 of whom entered or exited on the day of plaintiff's accident. *See* Aff. of Robert E. Stedman.

[4] While not all persons walking to or from the escalator would necessarily pass over the uneven seam, it is apparent from the photograph submitted by the parties and made a part of the

In January 2005, plaintiff instituted this action to recover for her injuries, claiming over $16,000 in medical expenses and special damages, and a 20 percent permanent impairment of her left knee. The complaint alleges that WMATA negligently maintained the sidewalk and premises where plaintiff tripped. WMATA thereafter moved for summary judgment on plaintiff's claims, and plaintiff filed a brief in opposition. The matter having been fully briefed and argued, the merits of WMATA's motion are addressed here.

## II.

The principles governing summary judgment are well-established. A party's motion for summary judgment should be granted if "there is no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law." FED. R. CIV. P. 56(c). In determining whether to grant a party's motion, a court must assess the evidence offered by both parties and "determine whether there is a genuine issue for trial" after viewing the evidence in the light most favorable to the non-moving party and resolving all factual disputes in that party's favor. *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250 (1986). To defeat a summary judgment motion, the non-moving party may not rest upon mere allegations or denials, but must "set forth specific facts showing that there is a genuine issue for trial." *See Celotex Corp. v. Catrett*, 477 U.S. 317, 324 (1986). The facts set forth, moreover, must be more than a mere scintilla of evidence; rather, the evidence offered must be sufficient for a reasonable factfinder to find in the non-moving party's favor. *See id.* at 248-251.

## III.

Here, the parties dispute not the facts, but the nature of the standard of care to which

_____

summary judgment record, that many, if not the vast majority of them, would surely do so.

WMATA must be held.  More specifically, the parties dispute whether WMATA, as a common

carrier of persons,[5] had a duty to exercise the highest degree of practical care with respect to the

maintenance of the walkway where plaintiff tripped, or merely a duty to exercise ordinary,

reasonable care with respect to this walkway.  This question is dispositive, as it is well

established under Virginia law[6] that the failure to correct an irregularity in a sidewalk surface is

not a violation of the duty of ordinary care where, as here, the irregularity is an inch or less and

not known to be a hazard.[7]  By contrast, there may exist a jury issue in this case if the applicable

---

[5] While WMATA has not conceded that it is a common carrier, it has stipulated that it may be held to the standard of a common carrier for purposes of this litigation.  *See Jones v. Wash. Metro. Area Transit Auth.*, Case No. 1:05cv11 (June 16, 2005) (Stipulation of Facts).

[6] Virginia law governs this case.  The Metro Compact, the source of federal jurisdiction here, provides that WMATA "shall be liable ... for its torts ... committed in the conduct of any proprietary function *in accordance with the law of the applicable signatory* [*i.e.*, Maryland, Virginia, or the District of Columbia] (*including rules on conflict of laws*)."  *See* Metro Compact § 80 (emphasis added).  The Fourth Circuit has concluded, in an unpublished opinion, that this language establishes a *lex loci delicti* rule for tort claims.  *See Madison v. Wash. Metro. Area Transit Auth.*, 1993 U.S. App. LEXIS 10444 at 4 n.3 (4th Cir. May 4, 1993).  Accordingly, because the alleged negligence in this action occurred in Virginia, Virginia law governs this case.

[7] *See, e.g.*, *Med. Ctr. Hosp. v. Sharpless*, 229 Va. 496 (1985) (sidewalk segment raised one-half inch above adjacent segment); *City of Newport News v. Anderson*, 216 Va. 791 (1976) (one inch sidewalk depression); *Childress v. City of Richmond*, 181 Va. 267 (1943) (one and five-eighth inch sidewalk depression); *City of Roanoke v. Sutherland*, 159 Va. 749 (1933) (one and one-eighth inch sidewalk depression); *City of Richmond v. Schonberger*, 111 Va. 168 (1910) (stone raised two inches above street surface).
    The defendants in the majority of these cases are municipalities.  While there is some dispute as to whether a municipality and a private land owner have the same duty of ordinary care with respect to sidewalk maintenance, *compare Gochin v. Wal-Mart Stores*, 48 Va. Cir. 166, 166 (1999) (same duty), *with Sharpless*, 229 Va. at 498 (duties "not necessarily" the same), this dispute is irrelevant here because WMATA is an arm of the state government, *see Potomac Elec. Power Co. v. State Corp. Comm'n*, 221 Va. 632, 634 (1980), and thus its duty of ordinary care with respect to sidewalk maintenance is the same as that of a municipality, *see Commonwealth v. Coolidge*, 237 Va. 621 (1989) (holding municipality standard of ordinary care for sidewalks applicable to state in case arising from slip-and-fall on prison premises).  There is no merit to plaintiff's contention that WMATA should not be treated as a governmental entity because it is

standard of care is the highest duty of practical care.  Accordingly, the question whether the record facts give rise to a triable issue of negligence — and thus whether summary judgment is appropriate — turns on the issue of WMATA's duty of care.  Because this is a legal determination, involving no weighing of evidence or assessments of credibility, resolution by way of summary judgment is appropriate.

It is well-settled, both in Virginia and in other jurisdictions, that a common carrier "must exercise the highest degree of practical care for the safety of its passengers."  *Crist v. Wash., Va. & Md. Coach Co.*, 196 Va. 642, 645 (1955); *see also Shamblee v. Virginia Transit Co.*, 204 Va. 591, 593 (1963) ("highest degree of care"); *Tri-State Coach Co. v. Stidham*, 191 Va. 790, 795 (1951) ("very high degree of care"); *Norfolk-Southern Ry. Co. v. Tomlinson*, 116 Va. 153, 156 (1914) ("highest degree of care"); *Kaplan v. Balt. & Ohio R.R. Co.*, 113 A.2d 415, 416 (Md. 1955) ("utmost degree of care"); *Pierce v. Balt. & Ohio R.R. Co.*, 128 S.E. 832, 833 (W. Va. 1925) ("highest degree of care").  This heightened standard of care, which imposes liability on carriers for passenger injuries resulting from even "the slightest negligence," *see Shamblee*, 204 Va. at 593, has its origins in the common law, not statutes, and derives from the notions (i) that motorized travel is a particularly dangerous activity, and (ii) that during carriage, passengers are completely dependent on the carrier for their safety.  *See Va. Ry. & Power Co. v. Dressler*, 132 Va. 342, 362 (1922).  As the Supreme Court of Virginia has put it, "[t]he reason for the high degree of care required of carriers is the tender regard the law has for life and limbs, and the fact

_____

not subject to the same limit of liability as other state agencies under the Virginia Tort Claims Act, *see* VA. CODE ANN. § 8.01-195.3; *Wash. Metro. Area Transit Auth. v. Briggs*, 255 Va. 309 (1998), as it is well-settled that the Virginia Tort Claims Act has no bearing on the state's duty of care with respect to those activities for which it is not immune.  *See Coolidge*, 237 Va. at 623.

that the carrier has the selection, control, management and operation of the whole instrumentalities of carriage, and a limited control over and direction of the conduct of the passenger." *Id.*; *see also Balt. & Ohio R.R. Co. v. Wightman*, 70 Va. 431, 445 (1877) ("when carriers undertake to convey passengers by the powerful but dangerous agency of steam, public policy and safety require that they should be held to the greatest possible care and diligence.").

Consistent with this underlying rationale, courts in Virginia and elsewhere have generally held that a carrier's duty of the highest degree of practical care does not extend to the condition of station premises. *See Cleveland v. Danville Traction & Power Co.*, 179 Va. 256, 259-60 (1942) (citing 1 THOMPSON ON NEGLIGENCE § 28) ("the highest degree of care ... applies only to those means and measures of safety which the passenger of necessity must trust wholly to the carrier. *It is in general applicable only to the period during which the carrier is in a certain sense the bailee of the person of the passenger.*") (emphasis added); *Kaplan*, 113 A.2d at 416-17 (holding carrier subject to ordinary care standard for maintenance of station premises). Instead, courts have generally held that where the less risky and more commonplace aspects of a carrier's business are concerned, the law imposes on carriers, just as it does with respect to other proprietors of premises, including municipalities, a duty of ordinary care. Thus, courts in Virginia and in neighboring jurisdictions have consistently held carriers to the standard of "*reasonably* safe and adequate" with regard to "stations and approaches for [the carriers'] patrons." *Burr v. Va. Ry. & Power Co.*, 151 Va. 934, 949 (1928) (emphasis added); *accord Va. Stage Lines, Inc. v. Newcomb*, 187 Va. 677, 679 (1948) (applying ordinary care standard in case of slip-and-fall in bus terminal); *Kaplan*, 113 A.2d at 417 ("a carrier owes a duty to all persons coming to its station ... to exercise ordinary care to keep the station and the approaches thereto in

6

a reasonably safe condition"); *Pierce*, 128 S.E. at 833 ("The care required of a carrier for the protection of a passenger on its premises involves reasonable care to provide maintain safe and adequate stations, platforms, walks, steps, and landings ... .").

Courts have often framed the question of a carrier's duty of care to a particular plaintiff in terms of the passenger-carrier relationship, holding the duty of the highest degree of practical care applicable only when the plaintiff could be considered the "passenger" of the defendant carrier at the moment the injury sued upon was sustained. *See, e.g.*, *Greater Richmond Transit Co. v. Wilkerson*, 242 Va. 65, 70 (1991); *Tri-State Coach Corp. v. Stidham*, 191 Va. 790, 795 (1951); *Dressler*, 132 Va. at 348. In this regard, several rules concerning the passenger-carrier relationship have developed, including (i) that a plaintiff's status as a passenger is deemed to commence at or about the time of boarding, *see, e.g.*, *Wilkerson*, 242 Va. at 70 ("Wilkerson became a passenger upon her entry into the bus"), and (ii) that that status continues "until after the [plaintiff] has alighted from the conveyance and has had a reasonable opportunity to reach a place of safety," *Stidham*, 191 Va. at 795. Importantly for present purposes, a number of cases from other jurisdictions also hold that "a passenger ... making a necessary transfer from one car or train to another, as a part of one continuous trip, does not lose his status as a passenger while making the transfer." *Patterson v. Duke Power Co.*, 36 S.E.2d 713, 714 (N.C. 1946); *see also Holtzman v. Norfolk & W. Ry. Co.*, 136 S.E. 855, 857 (W. Va. 1927) (plaintiff still a passenger while transferring). Citing these cases, the parties focused their arguments on whether plaintiff was, in the legal sense, defendant's passenger at the time of the accident, with defendant contending that plaintiff ceased to be a passenger once she had reached a point of safety at the bus drop-off point, and with plaintiff contending that she remained a passenger because she was

7

in the process of transferring to one of defendant's trains, and was all the time on premises under defendant's control.

While it is true that the passenger-nonpassenger dichotomy may be used to resolve the question presented here, it is also true that this dichotomy, unless properly understood, may breed confusion. This is so because common usage of the term "passenger" has stretched and distorted the term's meaning beyond its original meaning of one traveling on a public or private conveyance or transport by air, land, or sea. In common parlance today, the term "passenger" is often used to refer to a broader category of persons, including, for example, persons with travel tickets or who intend to purchase travel tickets who are walking to a terminal or station from a parking deck, or who are sitting on bar stools or chairs in airport lounges, or who are otherwise in or near station premises, but not actually boarding, riding, or alighting from the means of conveyance. But in the case of determining the proper standard of care owed by a carrier to a person, the term "passenger" is properly construed as limited to persons on the conveyances or transports or directly boarding or alighting from them. Only if so limited does the term properly focus on the risk and carrier control that warrants the imposition of a higher standard of care. Only passengers, so defined, are subject to the degree of carrier control and the type of hazard that warrants imposing the higher standard of care on a carrier.

The Supreme Court of Virginia implicitly recognized this rationale in *Dressler*, where it addressed a transferring plaintiff's passenger status in a case brought by a plaintiff who, having alighted from one of the defendant carrier's railcars, was struck within minutes by different railcar while she was crossing the street to board another railcar on a different line also operated by the same carrier. *See Dressler*, 132 Va. 350. In the course of holding that the plaintiff had

ceased to be defendant's passenger when she alighted safely at her original stop, the Supreme

Court of Virginia analyzed decisions from a variety of other jurisdictions in which a transferring

plaintiff was held to have remained a passenger of the defendant carrier, noting that "practically

all" of the decisions involved plaintiffs struck by cars from which they had just alighted or were

about to board, or else involved plaintiffs whose physical movement was in some way still under

the control of the defendant carrier.[8]   Considering the underlying rationale for the "high degree of

care required of carriers," *i.e.*, the dangerousness of travel and the carrier's complete control over

the passenger's safety, the Supreme Court of Virginia concluded that "[t]here seems to be good

reason ... for holding that the relation of passenger is not sustained while a passenger with a

transfer is outside the direction and control of the carrier and walking along the public highway."

*Id.* at 362.

Although not explicit on this point, *Dressler* appears to stand for the sensible principle

that the question whether the passenger-carrier relationship is sustained during transfer — and

thus whether the carrier's duty of the highest degree of practical care continues — turns on (i) the

degree and type of risks to which the person is exposed during transfer, and (ii) the degree and

type of control that the carrier maintains over the person.   Only where the risks involved and the

carrier's control over the person are essentially the same as those that exist during carriage

should the highest degree of practical care be imposed on a carrier.   In other circumstances, a

---

[8] *See Dressler*, 132 Va. at 361.   The Supreme Court of Virginia also acknowledged there
existed a third class of cases of transferring-passenger plaintiffs that it had not analyzed, namely
ones involving "injuries to passengers at the stations or on the platforms of commercial steam
railroads."   *Id.*   In regard to such cases, the Supreme Court of Virginia noted only that "[s]uch
railroads ... have complete control over ... their station platforms, yards, and sidings," and were
therefore different from other railways "in their relation to passengers."   *Id.* at 361-62.

duty of ordinary care is appropriate.

This principle, applied here, compels the conclusion that WMATA did not owe plaintiff a duty of the highest degree of practical care following her disembarkation from the bus and her subsequent approach to the escalator descending to the rail platform.  As in *Dressler*, plaintiff had "reached a place of safety" on the public walkway leading to the escalator, and from there "continued of her own volition to approach the point of re-embarkation in any way she saw fit." *Id.* at 366.  Also as in *Dressler*, plaintiff "was not in any [way] under the direction or control" of WMATA when she tripped and fell on the sidewalk.  *Id.*  The fact that she did not entirely depart the carrier's premises en route to her transfer location, as the plaintiff in *Dressler* did, does not alter the fact that she, like the *Dressler* plaintiff, was completely in control of her own movements.  Nor does it alter the fact that plaintiff, like her counterpart in *Dressler*, was not exposed to the risks associated with traveling in mass transit vehicles.  The one-inch seam on which plaintiff tripped is the kind of commonplace hazard that people completely uninvolved with common carriers encounter every day.  Accordingly, at the time she tripped, plaintiff was not a passenger to whom WMATA owed a duty of the highest degree of practical care.

The compelling logic of this is illustrated by the following.  There is no doubt that WMATA would have a duty of only ordinary care to a person who, without intent to take the Metro, traversed the uneven seam on the way to purchase a newspaper from one of the nearby machines, to read the large signboard Metro map, or to purchase a ticket from a ticket machine for use on another day.  Such a person could not reasonably be labeled a passenger and hence would be due only ordinary care from WMATA.  There is simply no sound reason in principle to treat plaintiff differently, and impose a higher standard of care on WMATA, simply because she

intended to board the Metro downstairs, an intention she might have changed at any point, either before or after crossing the uneven seam.  Thus, the applicable standard of care should not turn on a person's intention, but rather on the degree of the carrier's control over the person, and the nature of the risks to which the person is exposed.

In sum, WMATA owed plaintiff a duty of ordinary care, not the highest degree of practical care, with respect to the uneven seam in the sidewalk on which plaintiff tripped and injured herself.  Because it is clear that WMATA did not violate its duty of ordinary care by failing to level the uneven seam, there is no triable issue of negligence in this case. Summary judgment is therefore appropriate.

An appropriate order will issue.


_____/s/_____

T.S. Ellis, III

United States District Judge

Alexandria, Virginia

July 25, 2005